REEL 2900 PG 1313

## REGULATORY AGREEMENT

**AGREEMENT** made as of April 27 , 1999 by and between **SCHAFER MEWS HOUSING DEVELOPMENT FUND CORPORATION** ("Owner"), a New York corporation having an office at c/o The Lantern Group, Inc., 690 Eighth Avenue, Fifth Floor, New York, New York 10036 and **THE CITY OF NEW YORK** ("City"), acting by and through its Department of Housing Preservation and Development ("HPD"), having an office at 100 Gold Street, New York, New York 10038.

**WHEREAS**, the Owner is the owner of the real property known as **111-123 E. 118th St., N.Y., N.Y.** and more particularly described in Schedule A annexed hereto (the "Premises"); and

**WHEREAS**, the City has made or will make one or more loans to the Owner (collectively, the "Loan") for the acquisition and/or construction of the Premises as residential dwelling units pursuant to Section 576-c of Article XI of the Private Housing Finance Law and such Loan is secured by one or more mortgages on the Premises (collectively, the "Mortgage"); and

**WHEREAS**, Owner has agreed to use the Premises exclusively for the purposes permitted under said Section 576-c and as otherwise set forth herein;

**WHEREAS**, HPD, as the "supervising agency" under said Section 576-c, has the authority to set initial rents for each unit at the Premises and Owner agreed, as a condition to the Loan, to charge the rent determined in accordance herewith, .

**NOW THEREFORE**, in consideration of the premises, the parties agree as follows:

1. Ownership Restrictions. During the Restriction Period (as hereinafter defined), the Premises shall at all times be owned by (i) a housing development fund corporation incorporated under Article XI of the New York Private Housing Finance Law, (ii) a wholly owned subsidiary of such a corporation, (iii) a limited partnership the controlling interest of which is held by such corporation and which has agreed to limit profits or rate of return of investors in accordance with a formula approved by HPD or (iv) any other entity acceptable to HPD. In addition, for so long as any unit at the Premises shall be occupied by a tenant whose occupancy began during the Restriction Period, the Premises shall not be submitted to condominium or cooperative ownership. Nothing contained herein shall be deemed consent by the City to any transfer of ownership of the Premises.

2. Use and Occupancy Restrictions.

(a) During the Restriction Period, the Premises shall be used exclusively as housing accommodations for persons of low income (as hereinafter defined) not less than sixty percent (60%) of whom shall be Homeless Tenants (as hereinafter defined) unless otherwise approved by HPD. For purposes hereof,

"persons of low income" shall mean, unless otherwise agreed by HPD, individuals whose income (as hereinafter defined) in the calendar year in which their tenancy shall commence shall not exceed sixty percent (60%) of the New York primary metropolitan statistical area median income published by the U.S. Department of Housing and Urban

111-123 W. 118th St

Development, as the same may be adjusted from time to time ("Median"), provided that a person of low income at the time of initial occupancy in the Premises shall continue to be deemed a "person of low income" entitled to occupy the Premises notwithstanding that the income of such person shall have subsequently increased.

"Income" shall mean total income from all sources received or anticipated to be received by the head of the household (including permitted co-occupants) during the then current calendar year, including the types of income described in 24 CFR 813.106(b) and excluding the types of income, such as sporadic, temporary or non-recurring income, described in 24 CFR 813.106(c) or any successor regulations.

"Homeless Tenants" shall mean persons of low income referred by the City who, prior to their initial occupancy in the Premises, resided in emergency shelter facilities operated by or on behalf of the City or are otherwise in need of emergency shelter as determined by the City.

(b) Owner shall enter into an agreement with the appropriate agency of the City for the referral of Homeless Tenants to the Premises.

3.    Rent Stabilization and PHFL Provisions.

(a) Applicability. Upon completion of the construction of the Premises contemplated by the Loan, the units shall be subject to the Rent Stabilization Law of 1969, as amended, and the Rent Stabilization Code promulgated and adopted pursuant thereto (the "Rent Stabilization Code") and Owner shall register the initial rent or rents established by HPD under Section 3(b) below as the initial legal registered rent or rents under and in accordance with the Rent Stabilization Code.

(b) Legal Rent. Upon completion of the construction of the Premises contemplated by the Loan, HPD shall establish for each unit an initial rent in an amount equal to the Higher Legal Rent (as hereinafter defined), or, if a unit may have higher and lower legal rents as described in Section 3(d) below, higher and lower initial rents for such unit equal to the Higher Legal Rent and Lower Legal Rent (as hereinafter defined), respectively. For purposes hereof,

"Higher Legal Rent" shall mean, with respect to any unit, the reasonable rent for such unit, which shall be the greater of (i) the unit's allocable portion of the amount necessary to pay all maintenance and operating costs and to fully amortize the Loan over thirty years with annual interest at a rate two percent in excess of the "prime rate" published by The New York Times as of the date of completion of the construction contemplated by the Loan, as determined by HPD and (ii) the FMR (as hereinafter defined) of such unit.

"Lower Legal Rent" shall mean an amount equal to 30% of 55% of the Median.

(c) Adjustment of Legal Rent. The legal regulated rent(s) for each unit under the Rent Stabilization Code shall be adjusted from time to time in accordance with the Rent Stabilization Code, except that during the Restriction Period, Owner shall not seek or be entitled to any

2

REEL 2900 PG 1315

increase in the legal regulated rent(s) by reason of (i) the vacancy of the unit, (ii) any improvements to the unit paid for by income from the Premises, reserves required to be maintained by Owner with respect to the Premises or proceeds of the Loan or (iii) any other supplemental or additional increase granted under the Rent Stabilization Code, unless approved by HPD.

(d)     **Multi-Tier Rents.**  HPD may seek an order of the New York State Division of Housing and Community Renewal or its successor pursuant to Section 2521.1(m) of the Rent Stabilization Code providing that (i) each unit shall have a higher and lower legal regulated rent for the purposes of the Rent Stabilization Code and (ii) the higher legal regulated rent shall apply to a unit during the Restriction Period and for so long thereafter as such unit shall continue to be occupied by a tenant whose tenancy commenced prior to the expiration thereof, and the lower legal regulated rent shall apply thereafter, unless otherwise approved by HPD upon a demonstration of hardship by Owner.  Owner shall cooperate fully with the efforts of HPD to obtain such order.

## 4. Additional Rent Restrictions.

(a)     **Maximum Collectible Rent.**  Notwithstanding that the legal rent which may be charged for a unit under the Rent Stabilization Code may be higher, Owner shall not (except as provided in Section 4(d) below) lease any unit for an amount exceeding the MCR (as hereinafter defined) of such unit.  For purposes hereof,

"MCR" shall mean

(A) For Non-FMR Units (as hereinafter defined), the greater of (i) the Shelter Allowance (as hereinafter defined) and (ii) the Percentage Rent (as hereinafter defined) applicable to the tenant of such unit, it being intended that such units shall be affordable at public assistance levels, and

(B) For all other units, the FMR (as hereinafter defined) of such unit.

"FMR" shall mean, for each unit, the fair market rent for such unit determined by HPD from time to time.  HPD may rely upon independent, objective measures of the fair market rent of the units, including the determinations and adjustments of fair market rents made by the United States Department of Housing and Urban Development, to the extent it shall deem appropriate.

"Non-FMR Unit" shall mean a unit lawfully occupied by a tenant who, in the opinion of HPD, is unable to pay an amount equal to the FMR for the unit and who is unable to obtain rental or housing assistance which would enable such tenant to pay the FMR for the unit.

"Shelter Allowance" shall mean the public assistance shelter allowance plus the public assistance utility allowance established by the State of New York, as the same may be enhanced or amended from time to time.

3

"Percentage Rent" shall mean the following:

(i) for Homeless Tenants and Cut-Off Tenants (as hereinafter defined) whose income is less than fifty-five percent (55%) of the Median, thirty percent (30%) of such tenant's income;

(ii) for all other tenants whose income is less than or equal to sixty percent (60%) of the Median, thirty percent (30%) of fifty-five percent (55%) of the Median;

(iii) for tenants whose income exceeds sixty percent (60%) of the Median but is less than seventy percent (70%) of the Median, thirty percent (30%) of sixty-five percent (65%) of the Median;

(iv) for tenants whose income exceeds seventy percent (70%) of the Median but is less than eighty percent (80%) of the Median, thirty percent (30%) of seventy-five percent (75%) of the Median; and

(v) for tenants whose income exceeds eighty percent (80%) of the Median, the greater of (A) thirty percent (30%) of eighty percent (80%) of the Median and (B) the FMR.

"Cut-Off Tenants" shall mean tenants who, upon initial occupancy in the Premises, received assistance under a federal program for rental or housing assistance or a comparable program and who, through no fault of their own, shall no longer receive such assistance.

(b) Relationship of Legal Rent and MCR. The restrictions imposed by this Section 4 shall be in addition to and wholly independent of the Rent Stabilization Code and any other restrictions imposed by law or by agreement. If the legal regulated rent for a unit under the Rent Stabilization Code shall exceed the MCR for such unit, Owner shall not collect such legal regulated rent and the difference between the amount collected by Owner and the legal regulated rent shall be deemed assistance to the tenant and not a preferential rent. If the MCR for a unit shall exceed the legal regulated rent for such unit, Owner shall not charge or collect in excess of the legal regulated rent unless otherwise permitted by law. The MCR for a unit shall not be registered as the legal regulated rent for such unit under the Rent Stabilization Code, which shall be determined solely under Section 3 above.

(c) Adjustment of MCR. The MCR of a unit shall be determined upon initial occupancy thereof by a tenant and not more frequently than once in each calendar year thereafter until such unit is vacated, except that the MCR of a unit shall be redetermined at such time as such unit shall become or shall cease to be a Non-FMR Unit.

(d) Non-Complying Tenants. The restrictions contained in this Section 4 shall not apply to units occupied by Non-Complying Tenants (as hereinafter defined). If a tenant shall be or become

4

REEL 2900 PG 1317

a Non-Complying Tenant, Owner may immediately increase the rent payable by such tenant to the maximum amount permitted to be charged by law.

"Non-Complying Tenant" shall mean a tenant (a) who fails, for more than (30) days after a written request by Owner, to submit annual income information required by Owner or to apply for available rental assistance or (b) who submits false information to Owner or (c) whose rental assistance is denied or discontinued for more than thirty (30) days by reason of the act or omission of such tenant.

(e) Lease Terms. Unless otherwise approved by HPD, Owner shall lease each unit for a term of at least one year for an amount equal to the then applicable MCR payable in twelve equal monthly installments. Owner shall provide building-standard furniture and basic gas and electric service to each unit without additional charge. The rent payable under each lease shall not be adjusted during the term thereof unless such unit shall become or shall cease to be a Non-FMR Unit or the tenant of such unit shall become or shall cease to be a Non-Complying Tenant.

(f) Survival. The restrictions contained in this Section 4 shall commence upon the the date hereof and, with respect to units occupied by a tenant whose occupancy of the Premises commenced during or prior to the expiration of the Restriction Period, shall survive the expiration of the Restriction Period and continue for so long as such tenant shall continue to occupy a unit at the Premises.

5. Additional Restrictions. The acquisition and/or construction of the Premises shall be financed in whole or in part by funds received from HUD under the following program(s):

```
_ Section 8 Moderate Rehabilitation
x Shelter Plus Care
x HOME
x HOPWA
_ Other (Specify) _____
```

In addition, Owner may receive low income housing tax credits under Section 42 of the Internal Revenue Code with respect to the Premises. Owner shall comply with the use, occupancy and rental restrictions contained in Schedule B annexed hereto and the other restrictions contained in the regulations promulgated in connection with such programs, as applicable.

6. Proof of Compliance. During the Restriction Period, (a) Owner shall use its best efforts to collect and verify income and eligibility information from all tenants upon initial occupancy and annually thereafter and (b) Owner shall furnish to HPD within ninety (90) days after a request therefor and, in any event, on or before April 1 of each year, (i) a certified rent roll for the Premises with copies of leases (if requested), and (ii) a certification that each tenant who began occupancy during the prior year is eligible to occupy the Premises under the terms of this Agreement and the rent being paid by every tenant does not exceed the maximum amount permitted to be collected from such tenant under the terms of this Agreement, together with supporting documentation.

5

REEL 2 9 0 0 PG 1 3 1 8

Owner shall retain all documentation relating to such tenant for at least three years after initial occupancy.

7. <u>Investigations</u>.  Owner shall be bound by and comply with the provisions of the Investigation Clause Rider annexed hereto.

8. <u>Enforcement</u>.  If a violation of any of the restrictions or covenants contained in this Regulatory Agreement occurs, the City may, without regard to whether it is the owner of any land or interest affected by these covenants, (i) institute and prosecute any proceeding at law or in equity to abate, prevent or enjoin any such violation or to compel specific performance by Owner of its obligations hereunder and/or (ii) if such occurrence remains uncorrected for a period of thirty (30) days after written notice thereof to Owner, extend the Restriction Period by up to ten (10) years by notice to Owner.  No delay in enforcing the provisions hereof as to any breach or violation shall impair, damage or waive the right of any party entitled to enforce the provisions hereof to obtain relief against or recover for the continuation or repetition of such breach or violation or any similar breach or violation hereof, now or later.

9. <u>Lease Riders</u>.  Owner shall annex to all leases any riders required by the City or the New York State Division of Housing and Community Renewal advising tenants of their rights under the Rent Stabilization Code and this Agreement and providing for the termination of any lease and eviction of any tenant who falsely or fraudulently certifies income to Owner.

10. <u>Provision of Social Services</u>.  During the term of the Restriction Period, Owner shall be responsible for implementing and overseeing the provision of necessary social services.  Such services may be provided by qualified in-house staff and/or qualified consultant organizations.

11. <u>Binding Nature of Restrictions</u>.  This Agreement shall be recorded against the Premises.  The restrictions and covenants contained in this Agreement shall run with the land and be binding upon Owner and all of Owner's successors, assigns, grantees and lessees.  All references to "Owner" in this Agreement shall include Owner's successors, assigns, grantees and lessees.

12. <u>Amendments</u>.  This Agreement may only be amended by HPD and Owner by an instrument in recordable form executed by both parties.

13. <u>Notices</u>.  All notices shall be given by certified or registered mail, return receipt requested, to the respective parties hereto, at the addresses first above written, unless such addresses are otherwise modified in writing.

14. <u>Expiration</u>.  Except as otherwise expressly provided herein, the restrictions contained herein shall remain in effect from the date hereof until the latest of (a) the thirtieth anniversary of the date hereof, (b) the maturity date of the Loan or (c) the date on which the Loan shall be repaid in full (such period being the "<u>Restriction Period</u>"), whereupon such restrictions shall expire and be of no further force or effect.  The City shall, at its sole cost and expense, execute and deliver to Owner a document in recordable form requested by Owner to reflect the expiration of the Restriction Period.  Nothing contained herein shall be construed to terminate any restrictions

6

REEL 2 9 0 0 PG 1 3 1 9

contained in the Rent Stabilization Code or imposed by any other laws, regulations or agreements applicable to Owner or the Premises.

15. **Conflicts.** In the event there is any conflict between the terms of the Regulatory Agreement and the terms of the Mortgage, the terms of the Regulatory Agreement shall prevail.

16. **No Waiver.** No failure or delay on the part of the City to exercise any right, power or remedy under this Agreement or available at law or in equity shall operate as a waiver thereof, or limit or impair the City's right to take any action or to exercise any right, power or remedy hereunder, without notice or demand, or prejudice its rights against Owner in any respect.

17. **No Beneficiary.** The provisions of this Agreement are solely and exclusively for the benefit of the City and Owner and no other person shall be the beneficiary of such provisions, any or all of which may be modified or waived by the City and Owner in their discretion.

**IN WITNESS WHEREOF,** the parties have executed this Agreement as of the date stated hereinabove.

THE CITY OF NEW YORK
DEPARTMENT    OF    HOUSING    PRESERVATION    AND
DEVELOPMENT

By:
Name: Lee Warshavsky
Title: Assistant Commissioner

SCHAFER MEWS HOUSING DEVELOPMENT
FUND CORPORATION

By:
Name: Carol Jackson
Title: Secy.

APPROVED AS TO FORM
BY STANDARD TYPE OF
CLASS FOR USE UNTIL August 31, 1999
By:/s/    Daniel Muller
    Acting Corporation
        Counsel

7

REEL 2900 PG1320

## ACKNOWLEDGEMENT BY ASSISTANT COMMISSIONER

STATE OF NEW YORK        )
                          ) ss.:
COUNTY OF NEW YORK       )

On this 27 th day of *April* , 1999 before me personally came Lee Warshavsky, to me known and known to me to be an Assistant Commissioner of the Department of Housing Preservation and Development of the City of New York, the person described in and which executed the foregoing instrument, and he acknowledged to me that he executed the same as Assistant Commissioner for the purpose and pursuant to the authority therein recited.

*Shirley Goldenberg*

Notary Public

SHIRLEY GOLDENBERG
Notary Public, State of N.Y.
No. 1480816
Qualified in Kings County
Commission Expires March 26, 19
7/28/2000

## ACKNOWLEDGEMENT BY CORPORATION

STATE OF NEW YORK        )
                          ) ss.:
COUNTY OF NEW YORK       )

On this 27 th day of *April* , 1999 before me personally came *CAROL JACKSON*, who being by me duly sworn, did depose and say that (s)he resides at *190 8th Ave, NYC* ; that (s)he is the _*Sec*_ of Schafer Mews Housing Development Fund Corporation, the corporation which executed the foregoing instrument; and that (s)he signed his or her name thereto by order of the Board of Directors of said corporation.

Notary Public

LEONARD H. FEDER
NOTARY PUBLIC, STATE OF NEW YORK
NO. 43-1126825
QUALIFIED IN RICHMOND COUNTY
COMMISSION EXPIRES JUNE 30, 1999

8

REEL 2900 PG 1321

## SCHEDULE A

### Property Description

All those certain plots, pieces and parcels of land, with the buildings and improvements thereon erected, situate, lying and being in the City and State of New York, designated on the Tax Map of the City of New York as:

| Block(s) | Lot(s) |
|----------|--------|
| 1767 | 5, 6, 7, 8, 9, 10, 109 |

County:    New York

| Street Address | Block | Lot |
|----------------|-------|-----|
| 111 E. 118th St | 1767 | 5 |
| 113 E. 118th St. | 1767 | 6 |
| 115 E. 118th St. | 1767 | 7 |
| 117 E. 118th St. | 1767 | 8 |
| 119 E. 118th St. | 1767 | 9 |
| 121 E. 118th St. | 1767 | 109 |
| 123 E. 118th St. | 1767 | 10 |

REEL 2 9 0 0 PG 1 3 2 2

## SCHEDULE B
## ADDITIONAL RESTRICTIONS

### I.   SHELTER PLUS CARE.

If the acquisition or construction of the Premises or a part thereof shall have been financed in whole or in part with a grant awarded under the Shelter Plus Care program in accordance with 24 CFR 582, then the following restrictions shall apply to such portion of the Premises for as long as the grant shall be awarded:

The Premises (or so much thereof as shall have been the subject of the grant) shall be occupied by persons who are

(a) homeless persons with disabilities (as more particularly defined in 24 CFR 582.5, persons who are seriously mentally ill; have chronic problems with alcohol, drugs, or both; or have AIDS and related diseases) and, if also homeless, the family of such a person; and

(b) very low income, except that low-income individuals may be assisted if the grant was awarded under the SRO component of the program in accordance with 24 CFR 813.105(b). For purposes hereof, "very low-income persons or families" means persons or families whose annual incomes do not exceed fifty percent (50%) of the median family income for the area, as determined by HUD with adjustments for smaller and larger families.

### II.   HOME.

If the acquisition or construction of the Premises or a part thereof shall have been financed in whole or in part with a grant awarded under the HOME Investments Partnership program in accordance with 24 CFR 92, then the following restrictions shall apply to such portion of the Premises for the period set forth below:

(A) The maximum collectible rents shall be not greater than the lesser of

(i) The fair market rent for existing housing for comparable units in the area as established by HUD under 24 CFR 888.111, less the monthly allowance for the utilities and services (excluding telephone) to be paid by the tenant; or

(ii) A rent that does not exceed 30 percent of the adjusted income of a family whose gross income equals 65 percent of the median income for the area, as determined by HUD, with adjustments for number of bedrooms in the unit.  In determining the maximum monthly rent that may be charged for a unit that is subject to this limitation, the owner or participating jurisdiction must subtract a monthly allowance for any utilities and services (excluding telephone) to be paid by the tenant.

REEL 2 9 0 0 PG 1 3 2 3

(B) Not less than 20 percent of the rental units shall be

(i) Occupied by very low-income persons or families (as defined above) who pay as a contribution toward rent (excluding any federal or state rental subsidy provided on behalf of the family) not more than 30 percent of the family's monthly adjusted income as determined by HUD. To obtain the maximum monthly rent that may be charged for a unit that is subject to this limitation, the owner or participating jurisdiction multiplies the annual adjusted income of the tenant family by 30 percent and divides by 12 and, if applicable, subtracts a monthly allowance for any utilities and services (excluding telephone) to be paid by the tenant; or

(ii) Occupied by very low-income families and bearing rents not greater than 30 percent of the gross income of a family whose income equals 50 percent of the median income for the area, as determined by HUD, with adjustment for smaller and larger families. In determining the maximum monthly rent that may be charged for a unit that is subject to this limitation, the owner or participating jurisdiction must subtract a monthly allowance for any utilities and services (excluding telephone) to be paid by the tenant.

(C) The period for which the foregoing restrictions shall be in effect shall be based on the nature of the activity for which the funds were used as indicated below:

Construction or acquisition of
existing housing
   - $15,000 to $40,000   10 years
   - Over $40,000            15 years
New construction or acquisition of
newly constructed housing    20 years

(D) Rental housing shall not be deemed to be not in compliance with the foregoing restrictions if the noncompliance is temporary and caused by increases in the incomes of existing tenants and if actions satisfactory to HUD are being taken to ensure that all vacancies are filled in accordance with this section until the noncompliance is corrected. Tenants who no longer qualify as low-income families must pay as rent the lesser of the amount payable by the tenant under State or local law or 30 percent of the family's adjusted monthly income, as recertified annually. The preceding sentence shall not apply with respect to funds made available under this part for units that have been allocated a low-income housing tax credit by a housing credit agency pursuant to section 42 of the Internal Revenue Code of 1986 (26 U.S.C. 42).

III.   **HOPWA.**

If the acquisition or construction of the Premises or a part thereof shall have been financed in whole or in part with a grant awarded under the Housing Opportunities for People with AIDS program in accordance with 24 CFR 574, then the following restrictions shall apply to such portion of the Premises for the period set forth below:

The building or structure assisted under the program will be maintained as a facility to provide assistance for persons with acquired immunodeficiency syndrome or a related disease (as defined in 24 CFR 574.3) and the families of such persons

(i) For a period of not less than 10 years in the case of assistance involving new construction, substantial rehabilitation or acquisition of a facility; and

(ii) For a period of not less than 3 years in cases involving non-substantial rehabilitation or repair of a building or structure.

IV.    **LIHTC.**

If the Premises shall receive an allocation of low income housing tax credits under Section 42 of the Internal Revenue Code of 1986 ("Section 42"), then (a) this Agreement shall be deemed the "extended low-income housing commitment" required thereunder, (b) the Restriction Period shall not expire prior to the fifteenth (15th) anniversary of the expiration of the "compliance period" as defined therein and (c) and the following additional restrictions shall apply during the Restriction Period:

(i) The number of units occupied by persons whose income at the time of their initial occupancy shall be sixty percent (60%) or less of the Median shall at no time be less than the applicable fraction or number of units specified in the approved application for such credits and any subsequent certifications made in connection therewith. For the purposes hereof, the number of units satisfying this requirement shall  e determined in accordance with paragraphs (g)(2)(D) and (E) of Section 42. In addition, before the close of the three year period following the termination of the Restriction Period, (x) there will be no increase in the gross rent of a unit except as permitted by Section 42, and (y) no tenant of a unit in the Premises may be evicted or any tenancy terminated without good cause.

(ii) Individuals who meet the income limitation applicable to the Premises under subsection (g) of Section 42 (whether prospective, present or former occupants of the building) shall have the right to enforce the requirement and prohibitions of the preceding clause (i) in the courts of the State of New York;

(iii) No portion of the Premises shall be sold or otherwise disposed of to any person unless all of the Premises shall be disposed of to such person; and

(iv) Owner shall not refuse to lease a unit to a holder of a voucher or certificate of eligibility under Section 8 of the United States Housing Act of 1937 because of the status of the prospective tenant as such a holder.

The provisions of this Agreement are intended to comply with the occupancy, rental and other requirements of Section 42. If, after the date hereof, there are amendments to Section 42 or the regulations promulgated thereunder or Internal Revenue Service rulings with regard thereto which are inconsistent with one or more provisions of this Agreement and adversely affect the tax credits available to Owner with respect to the Premises, then, upon written request of Owner, this

REEL 2900 PG 1325

Agreement shall be modified to the extent necessary to conform to such amendments, provided no such modification shall be in any way inconsistent with the Rent Stabilization Code or any other applicable State or local law.